GAY AND LESBIAN SERVICES
NETWORK, INC., et al.,
Plaintiffs,

v.

Steven BISHOP, et al., Defendants.

No. 92–0508–CV–W–1.

United States District Court,
W.D. Missouri, W.D.

Sept. 13, 1993.

Stephen Douglas Bonney, Kansas City, MO, for plaintiffs.

Dale H. Close, Kansas City, MO, for defendants.

## ORDER

WHIPPLE, District Judge.

### I. Introduction

Plaintiffs allege that the Kansas City Police Department's policy of assessing a fee for the granting of a parade permit on the basis of projected expenses related to policing such parade violates the First and Fourteenth Amendments to the United States Constitution. This action arises under provisions of 42 U.S.C. § 1983, and the court's jurisdiction is properly invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a), and 42 U.S.C. § 1983.

1. Gay and Lesbian Services Network, Inc. is a corporation organized under Missouri law. It performs some of its work under the name Gay and Lesbian Awareness which is registered as a fictitious name pursuant to Mo.Rev.Stat. § 417.-210.

2. These members are Marc Hein, Carla R. Engle and Jerrold J. Hagerty.

Because there are few, if any, material facts in dispute in this case, the parties agreed to submit this matter to the court on a stipulated record. After careful review of the pleadings, exhibits, depositions and trial briefs, for the reasons stated *infra*, the court rules that said policy constitutes a content-based restriction on expressive activity, is without a compelling government interest, and is thus facially violative of the First Amendment.

### II. Findings of Fact

Plaintiffs are Gay and Lesbian Services Network, Inc.,[1] an organization providing support and other services for its constituents in the gay and lesbian community in the Kansas City metropolitan area, and three members of the organization.[2] Defendants are members of the Board of Police Commissioners (hereafter "Board")[3] and the Chief of the Kansas City, Missouri Police Department (hereafter "Police Department").[4] Defendants are being sued in both their official and individual capacities.

In June of 1990 and again in June of 1991, Plaintiffs organized and held parades in Kansas City, Missouri in connection with national Gay and Lesbian Pride Week. The Police Department provided traffic control services for both parades without charge consistent with department policy. Between January 19 and November 11, 1991, forty-one (41) parades were held in Kansas City, Missouri, and at each of those parades, the Police Department provided officers to conduct traffic control at no expense to the parade sponsors.

However, in a memorandum dated October 29, 1991 (hereafter "the Cowdrey Memorandum"), Sergeant John Cowdrey, Operations Sergeant in the Department's Traffic Division, proposed that the Police Department

3. These members are: Bailus M. Tate, president; John A. Dillingham, vice-president; Jacqueline L. Paul, treasurer; Jack W.R. Headley, member; Emanuel Cleaver II, member.

4. Alfred C. Lomax was the Acting Chief of Police on June 9, 1992, the date on which the Department's policy being challenged in this proceeding was promulgated. Steven C. Bishop is the present Chief of the Police.

change this policy. Sergeant Cowdrey recommended that, beginning January 1, 1992, the Department provide free on-duty police coverage for only five (5) parades, those which "draw participants from a large segment of our community and also attract a large number of spectators."[5] Such a policy change was necessitated, argued Sergeant Cowdrey, by the recent "proliferation" of parades and the Department's lack of adequate personnel to supervise such while providing its numerous other services to the community.

The Cowdrey Memorandum stated that those parade sponsors who "were adamant in their desire for a parade," would need to hire "traffic officers in an off-duty capacity." In addition, it included a note from the Department's Major Harry Pottinger who stated that such a policy would save the Department between 1200 and 2400 man hours per year.

Deputy Chief Thomas Mills sent a letter, dated November 4, 1991, to Defendant Chief Steven C. Bishop endorsing the Cowdrey Memorandum citing "current staffing problems" as justification. On November 12, 1991, Defendant Bishop approved the proposal. In his deposition, Major Harry Pottinger reiterated Sergeant Cowedrey's justification for the policy change.

Early in 1992, Plaintiff Marc Hein filed an application for a parade permit for the 1992 Gay and Lesbian Pride Parade to be held on June 21, 1992 beginning in the city of Westwood, Kansas, and disbanding at Southmoreland Park in Kansas City, Missouri. On February 20, 1992, the Director of Public Works issued the permit pursuant to Kansas City Code § 34.143 [6]. As allowed in the ordinance, such grant was made after consultation with the Police Department's traffic division.

Sometime thereafter, between February and May, a fee of $496 for police services was established for the cost of hiring eight off-duty officers and one off-duty supervisor to police the Parade. On June 8, 1992, Plaintiffs filed this civil action challenging the constitutional validity of Defendants' new policy. Plaintiffs then attempted to secure a temporary restraining order enjoining the Police Department from charging Plaintiffs the $496 fee. The court denied said request on June 19, 1992, finding that because Plaintiffs intended to hold the parade even if required to pay the fee, Plaintiffs had an adequate remedy at law should the court ultimately find the fee unconstitutional, namely an order for reimbursement of the fee. Plaintiffs then paid the fee and held the parade as planned.

On June 9, 1992, Defendant Alfred C. Lomax, then acting Chief of Police modified the new policy on parades and processions in the form of Department Memorandum 92–9, which superseded the Cowdrey Memorandum and became the official Department policy effective immediately (hereafter "Current Policy"). The Current Policy states that the Department will recommend to the Director that *all* parade permits be denied unless the parade sponsors make arrangements to hire off-duty police officers through the Department's Traffic Off–Duty Employment Coordinator "to provide necessary police protection for such parades and processions." Parade sponsor cannot hire private security services to control traffic and block off public streets.

The Current Policy requires the Department to determine the number of officers required "to adequately provide police support for the parade" on the basis of the application and various factors for each stage of the parade or procession.[7] To determine

5. The parades which were to continue receiving police supervision were the following: St. Patrick's Day Parades in Brookside and in the downtown area, the Easter Parade, the Juneteenth Parade and the American Royal Parade.

6. Kansas City Code § 34.43 requires those wishing to sponsor a parade or procession involving the marching of people or driving of more than three (3) cars on public streets or highways to

seek a permit by the Director of Public Works. The ordinance outlines a variety of information which the applicant must supply involving the purpose of the parade, when and where it will be held, and the name of the sponsor.

7. The Current Policy requires the Police Department to consider the following factors:

1. Staging (0–25 officers)

the permit fee, the number of officers deemed necessary pursuant to the above factors is multiplied by the number of hours they are needed (minimum of three hours) which is then multiplied by $18/hour for officers and $28/hour for supervisors. Major Harry Pottinger, supervisor of the Traffic Division, testified in his deposition that the Police Department determines the fee solely on the basis of the factors listed in the Current Policy, and in no way considers the content or message of the Parade. However, he also testified that the number of officers for "crowd control" is determined "by the size of the crowd you're going to have." Furthermore, he stated that security officers are "kind of like a mobile parade response" and are assigned to handle crowd problems like drunks at the St. Patrick's Day Parade.

The Department does not charge for other police services, such as investigating traffic accidents, writing traffic citations,[8] and investigating crimes. The Department also provides on-duty officers, free of charge, to control traffic on the public streets surrounding the Sports Complex before and after Chiefs and Royals games.[9] In 1992, on-duty police officers worked approximately ten (10) Chiefs games and eighty-one (81) Royals games. The on-duty officers used for public street traffic control worked an average of three and one-half to four hours for each Chiefs game and an average of three hours for each Royals game. In controlling traffic for Chiefs and Royals games, on occasion lanes of public streets are closed and traffic is directed one way on a two way street.

The Police Department also provides free traffic control at various events held at the Kemper Arena in addition to police protection, supervision and escort for presidential and vice-presidential candidates and family per request by the Secret Service. The Police Department does not provide on-duty officers to control traffic for the March of Dimes Walkathons near Volker Park, the Hospital Hill Marathon, various bike races in Kansas City, Missouri or school Homecoming Parades.

In 1991, a couple of hundred people held an anti-abortion protest and rally outside the Planned Parenthood building located at 47th and Harrison Streets in Kansas City, Missouri. The Police Department assigned a number of officers to control vehicular traffic and be on alert to prevent disorder. During the protest, the officers closed part of Harrison Street for safety reasons. Consistent with Police Department policy of not charging a fee for maintaining the peace, no charge was made for policing the protest.

The Current Policy does not provide a means by which a parade sponsor can appeal

a. The number of streets to be controlled and/or closed.
b. The type of street to be controlled and/or closed, which shall take into consideration the traffic flow on the street.
c. The time of day and day of week of the parade.
d. The amount of traffic required to be rerouted as a result of the parade route.
e. The number of electric traffic control devices that are required to be operated manually by police officers as a result of the parade route.
f. The characteristics of the area of the parade route to include the volume of parade traffic, pedestrian traffic and speed limits of the area.
g. The number of supervisors with the requirement that there be at lease (sic) one supervisor if there are five (5) or more officers.
2. Parade control point (0–75 officers).
a. The number and size of the intersections to be controlled or closed.
b. The number of supervisors required as set out above.

c. Off route point control requirements.
3. Parade mobile route control (0–45 officers).
a. Whether or not the sponsors are requesting a ceremonial parade escort.
b. The size of the parade crowd.
c. The size of the parade in terms of number of parade participants.
d. The time of day and day of week of the parade.
e. The number of businesses that are effected by the parade route.
f. The type of intersections that are effected by the parade route.
4. Disbanning (sic) (0–10 officers).
a. Size and characteristics of parade.

8. A new City Ordinance will result in some of the court costs in drunk driving cases being returned to the Police Department to cover police services in such cases.

9. Such streets include: Raytown Road, Stadium Drive, Blue Ridge Cutoff and the exits off of Interstate 70.

the Department's fee determination. Nor does the Current Policy contain: (1) an exemption for indigents who cannot afford to pay the fee; (2) any limit on the amount of fees that can be assessed for police protection at parades; or (3) any time limitations on when the Police Department must determine the fee or how long it has to make that determination.

### III.   Conclusions of Law

#### A.   Introduction

At the outset, it is necessary to limit the scope of the court's inquiry. The court is not concerned with the constitutionality of Kansas City Code § 34.143 as it gives the Director of Public Works authority to grant or deny a parade permit. The issues involved in such were neither briefed, nor raised in the pleadings. The ordinance is only relevant to the extent that it expressly gives the Director authority to seek assistance from the Police Department in determining whether to grant a parade permit. *see* § 34.143(d). Pursuant to said subsection, the Police Department issued both the Cowdrey Memorandum and the Current Policy, both of which Plaintiffs allege are in conflict with the First and Fourteenth Amendments. Each will be discussed in turn.

#### B.   Cowdrey Memorandum

■ Plaintiffs pray this court to rule on the constitutionality of the Cowdrey Memorandum because it constituted the governing policy when the $496 fee was determined. In contrast, Defendants present evidence of such issue's mootness. It is uncontested that the Cowdrey Memorandum no longer reflects the present policy of the Police Department. In addition, it is important to note that the only changes affected by implementation of the Current Policy concern elimination of the five parade exemption and designation of concrete standards for fee setting. There is no evidence in the record that either change affected the fee determination. In fact, it is the intuitive sense of the court that the fee amount would have been identical under the Current Policy.

Moreover, the Current Policy became effective on June 9, 1992, a date prior to payment of the fee and the holding of the parade. It is clear that the Current Policy, not the Cowdrey Memorandum constituted the Police Department's source of power to levy the permit fee when such was in fact levied. Thus, the court, based on both prudential considerations of self-restraint and the constitutional requirement that a "case or controversy" exist, declines to rule on the constitutionality of the Cowdrey Memorandum.

Accordingly, the court rules that Plaintiffs' constitutional challenge to the Cowdrey Memorandum is moot.

#### C.   Current Policy

■ The court's determination of the constitutionality of the Current Policy is guided to a large extent by the Supreme Court's recent ruling in *Forsyth County v. Nationalist Movement,* 505 U.S. ——, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). In this case, Forsyth County enacted an ordinance which required sponsors of private activities on public land to pay a permit fee on the basis of the cost to the county of administration and maintenance of public order. The Court held that such a restriction on speech was violative of the First Amendment because it was content-based, gave the county unbridled discretion to restrict speech,[10] and was without sufficient justification. *Id.* at —— – ——, 112 S.Ct. at 2403–05, 120 L.Ed.2d at 113–15.

Like the plaintiff in *Forsyth County,* Plaintiffs in the present case mount a facial challenge to the Current Policy. Such an approach is proper when application of the government action in the case under consideration may be constitutionally unobjectionable, its breadth "has the potential to chill the expressive activity of others not before the court." *Forsyth County,* 505 U.S. at ——, 112 S.Ct. at 2401, 120 L.Ed.2d at 110.

■ It is well established that parade participation constitutes expressive activity protected by the First Amendment. *Forsyth County,* 505 U.S. at —— – ——, 112 S.Ct. at 2400–01, 120 L.Ed.2d at 110–11; *Shuttles-*

---

10.   On this point, the case at bar is distinguishable. Unlike the ordinance at issue in *Forsyth County,* the Current Policy lists a variety of factors for the Police Department to consider when determining the permit fee.

worth v. City of Birmingham, 394 U.S. 147, 150–151, 89 S.Ct. 935, 938–939, 22 L.Ed.2d 162 (1969). It is also well settled that a municipality's attempt to charge a parade permit fee to cover the associated cost of policing such constitutes a prior restraint on speech. *Forsyth County*, 505 U.S. at ——, 112 S.Ct. at 2401, 120 L.Ed.2d at 111. Prior restraints bear a "heavy presumption against [their] constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990). However, the Supreme Court has ruled that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, rally or parade. *Forsyth County*, 505 U.S. at ——, 112 S.Ct. at 2401, 120 L.Ed. at 111. Public forums include those places "which by long tradition or by government fiat have been devoted to assembly and debate," such as parks, streets, and sidewalks. *Burson v. Freeman*, 504 U.S. ——, ——, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5, 13 (1992).

■ A permit scheme is constitutional as a reasonable time, place and manner restriction if it is content neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternatives for communication. *Forsyth County*, 505 U.S. at ——, 112 S.Ct. at 2401, 120 L.Ed.2d at 111. The burden of proof on these three factors falls squarely on the government. *Clark v. Community for Creative Non-violence*, 468 U.S. 288, 293, n. 5, 104 S.Ct. 3065, 3069, n. 5, 82 L.Ed.2d 221 (1984). If it is determined that the permit scheme is not content neutral, then it must be enjoined unless the government body can show that it is narrowly tailored to achieve a compelling government interest. *Burson v. Freeman*, 504 U.S. ——, ——, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5, 14 (1992).

In that the proper level of scrutiny is determined by whether the Current Policy is content neutral, it is necessary to start the inquiry with this issue. In *Boos v. Barry*, 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988), the Supreme Court ruled that restrictions upon expressive activity are content-neutral only if they "are justified without reference to the content of the regulated speech." One of the factors listed in the Current Policy is "crowd control." Major Harry Pottinger testified that the larger the crowd, the more officers required to police the parade.

■ Parades which concern controversial issues and either invite great applause or trigger substantial hostility will be penalized by the Current Policy. To implement such policy, the Police Department is required to examine the content of the parade sponsors' message, and "estimate the response of others to that content, and judge the number of police necessary to meet that response." *Forsyth County*, 505 U.S. at ——, 112 S.Ct. at 2403, 120 L.Ed.2d at 113. In short, the Current Policy constitutes a content-based restriction on free speech, and is thus subject to strict scrutiny.[11]

■ The Police Department attempts to justify the Current Policy on the basis of budgetary constraints. It contends that it "does not have adequate police personnel to maintain emergency call responses and other necessary police functions and still provide on-duty police officers for parades and processions." The Police Department portrays itself as a budget conscious bureaucrat with discretionary power to allocate limited funds in accordance with its knowledge of the community's needs. However, in *Forsyth County*, 505 U.S. at ——, 112 S.Ct. at 2404, 120 L.Ed.2d at 115, the Supreme Court expressly ruled that such an interest, while "undoubtedly ... important," does not rise to the level sufficient to justify a content-based permit fee system.

In addition, it is significant that the Police Department continues to provide on-duty police officers to provide traffic control for a wide variety of other events such as Chiefs and Royals games, protests such as the one which occurred outside Planned Parenthood in 1991, and various events which take place

---

11. In addition to "crowd control," the court is concerned that two other factors listed in the Current Policy may violate the Constitution: the number of "parade participants," and the "char-

acteristics" of the parade. Both, in application, may constitute content-based restrictions on First Amendment activity.

276

at the Kemper Arena. It is thus inconsistent for the Police Department to cite its poverty as a justification for the Current Policy.

### D. Additional Challenges

Plaintiffs raise additional challenges to the Current Policy concerning its lack of procedural safeguards, and its failure to provide an indigency exception. Because a determination of these issues is not necessary in reaching a resolution of the case at bar, the court expressly declines to consider them.

### IV. Remedy

Accordingly, it is ORDERED that the Current Policy is UNCONSTITUTIONAL, as violative of the First and Fourteenth Amendments to the United States Constitution. It is further

ORDERED that Defendant is ENJOINED from enforcement of the Current Policy.