BEAM, Circuit Judge,
dissenting.
I dissent because the Constitution does not allow a small group of passersby to censor, through their complaints, the content of a peaceful, stationary protest. The First Amendment knows no heckler’s veto, Robb v. Hungerbeeler, 370 F.3d 735, 743 (8th Cir.2004), even in an abortion case.
I.
When the government enforces a heckler’s veto, it infringes upon the First Amendment’s most vital role. The First Amendment guards jealously a citizen’s right to express even controversial and
*793 shocking messages because speech “may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.” Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The government confuses the role of(and violates) the First Amendment when it allows citizens to trigger speech suppression because the speech offends them (i.e., when it allows hecklers to veto). Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 54-55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (holding that, if a speaker’s opinion causes offense, that consequence is a reason for according it constitutional protection); Bachellar v. Maryland, 397 U.S. 564, 567, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970) (“[I]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.”) (quotations omitted); see Erznoznik v. Jacksonville, 422 U.S. 205, 209-210, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (citing Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)); Spence v. Washington, 418 U.S. 405, 412, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam); Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Brown v. Louisiana, 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Cox v. Louisiana, 379 U.S. 536, 550, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Wright v. Georgia, 373 U.S. 284, 292, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); Terminiello, 337 U.S. at 5, 69 S.Ct. 894; Robb, 370 F.3d at 743; Lewis v. Wilson, 253 F.3d 1077, 1081-82 (8th Cir.2001). Indeed, the protection against hecklers’ vetoes even forbids statutory schemes that would allow a disapproving citizen to silence a disagreeable speaker by complaining on other, apparently neutral, grounds. Reno v. ACLU, 521 U.S. 844, 880, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (holding that prohibition on knowingly communicating indecent material to minors in Internet forums was invalid because it conferred “broad powers of censorship, in the form of a ‘heckler’s veto,’ upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old-child ... would be present”).
The prohibition of hecklers’ vetoes is, in essence, the First Amendment protection against the government effectuating a complaining citizen^ viewpoint' discrimination. The genesis of the viewpoint discrimination matters not, for it is the removal of an unpopular or controversial idea that offends thé First Amendment.
II.
A listener’s reaction to speech is not a content-neutral basis for regulation. Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (citing Boos v. Barry, 485 U.S. 312, 321, 324, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)); Lewis, 253 F.3d at 1081. While the government can enact “content-neutral” restrictions based on the secondary effects the speech creates, an effect from speech is not secondary if it arises specifically from listeners’ reactions to the speech. Lewis, 253 F.3d at 1081 (citing Boos, 485 U.S. at 321, 108 S.Ct. 1157); see Robb, 370 F.3d at 743; see also Geoffrey R. Stone, Content Regulation and the First Amendment, 25 Wm. & Mary L.Rev. 189, 237-38 (1983).
In Lewis, the Missouri Department of Revenue (DOR) rejected Mary Lewis’s application for a license plate with the letters “ARYAN-1.” It argued that preventing this display was necessary to protect highway safety. We rejected the invitation to extend the secondary effects doctrine that far because the targeted “secondary ef *794 fects” of preventing “road rage” and protecting highway safety arose specifically from listeners’ reactions to the license plates. Lewis, 253 F.3d at 1081. The court concluded “[e]ven if we assume that the DOR made no judgment about the viewpoint of Ms. Lewis’s speech ... we reject its attempt to censor Ms. Lewis’s speech because of the potential responses of its recipients. The first amendment knows no heckler’s veto.” Id. at 1082 (emphasis added); accord Forsyth County, 505 U.S. at 134, 112 S.Ct. 2395 (holding that a restriction justified by the “cost of maintaining public order” was content based, not a secondary effect, because it was “associated with the public’s reaction to the speech”).
III.
When the officers arrived at the demonstration site the first time, they acknowledged that the demonstrators had a right to be where they were. Officer Woods testified that he saw no one standing in the roadway or holding signs over the street. After five to ten minutes, the officers left.
When the officers returned to the site, the only significant change was the presence and volume of the hecklers. Officer Woods still saw no one standing in or holding signs over the roadway.[3] He did see an argument between a demonstrator and a motorist. And the officers spoke with several complainants about the demonstration.[4] None of the complainants stated that appellants were holding signs over or standing on the roadway. Instead, the police report shows that the complainants were “distraught,” “shocked,” and “disgusted” by the signs. Captain Tarwater then explained to the demonstrators that their signs “were offending people passing through the intersection creating a hazard to public safety.” Appellants’ App. at 79.
Sergeant William Wranich also testified about the scene. He observed that drivers were pulling over, not because of an impaired view, but because some of appellants’ signs offended them. He also describes the order to remove the signs:
A. They were given an option to remove the signs, but they could protest as long as they weren’t using the offensive signs.
Q. Do you recall any officer ordering that specific signs be confiscated?
A. The order was that anyone holding the sign, refusing to give up the sign would be arrested.
Q. Okay. And when you say they were given a chance to put down the sign, did that include all of the signs that were present that day?
A. It was the offensive signs, the ones that the traveling public had complained about that were offensive.
Id. at 120-21 (emphasis added).
The other exhibits tell the same story. The record shows that Captain Tarwater told the demonstrators that “if they refused to put away the disturbing, graphic photos, they would be placed under arrest.” And the tickets the officers issued charge that the appellants “[d]id unlawfully ... obstruct a public street by hindering *795 or impeding the free and uninterrupted passage of traffic, by displaying graphic matter causing a traffic hazard by causing drivers to become emotionally distraught and causing them to swerve and slam on their brakes."
Although the officers argue in terms of their interests in protecting public Safety and preventing traffic obstruction, these concerns arose directly from listeners’ reactions. The' protestors could remain if they removed certain signs. Which signs? According to the exhibits described above, public safety demanded that the protestors remove the disturbing, graphic, shocking, offensive photos that the public had complained about. This police action is content based just as would be a state statute directing that “upon the complaint of any citizen that a demonstrator’s photo is offensive and causes the citizen to become too emotional to operate a vehicle, the state shall order the demonstrator to move.” Both the police in this case and the state that enacted the hypothetical statute could proffer content-neutral, “secondary effect” justifications. But because the concerns in both cases arise directly from the listeners’ reactions, the law deems them content based, not secondary effects. In other words, the law protecting against hecklers’ vetoes places meaningful limits on the secondary effects doctrine. Here, the.facts, when viewed in the light most favorable to the demonstrators, show the officers silenced the speaker for reasons that arose directly from the listeners’ reaction.
Myriad cases forbid the government from silencing the speaker to protect against the listener’s unlawful reaction. See, e.g., Coates, 402 U.S. at 614, 91 S.Ct. 1686. A state cannot forbid the use of a license plate bearing a .white-supremacy message based on the fear that passersby might become offended and experience road rage. Lewis, 253 F.3d at 1081. Nor does the interest in public safety allow a state to fprbid the KKK from adopting a highway, even though passersby may become outraged when they realize the Klan sponsors the highway. See Robb, 370 F.3d at 743. A state cannot forbid pamphlet distribution because recipients may litter. Schneider v. Town of Irvington, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939). And the danger that some patriots may react violently to. a jacket that says “FUCK THE DRAFT” does not justify the state to seize the jacket from one who wears it in a courthouse. Cohen, 403 U.S. at 23, 91 S.Ct. 1780.
In all of those situations, the speaker is protected, and the government must punish those who react lawlessly to a controversial message. Cf. Schneider, 308 U.S. at 162, 60 S.Ct. 146 (“There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers upon the streets.”). If the KKK-sponsored billboard angers a driver and causes her to speed, the police must ticket the driver.; If a motorist becomes outraged at a license plate that reads ARYAN-1, the law still charges the motorist with the duty to control his vehicle. If a veteran punches Mr. Cohen for wearing his jacket, the police must arrest the veteran for assault.
I don’t understand why, in this case, we target the speaker instead of the listener who fails to control his vehicle. We ticket a litterer, not the pamphleteer. But we ticket the pro-life sign holder, not the one who obstructs traffic by stopping erratically to protest the protestors. (I wonder if the Kansas City police would ticket, for littering, a pro-life pamphleteer whose “offensive” pamphlet caused a shocked recipient to drop it.) Missouri motorists must control themselves when a KKK road sign offends them, but apparently not when *796 confronted with “offensive” pro-life messages. The person who rear ends the car bearing an ARYAN-1 license plate is responsible for the accident, but in this case the police informed the sign holders that they could be held responsible for accidents caused by their controversial signs. The First Amendment does not allow such distinctions. Today, the court creates a content-based jurisprudence in abortion cases.
“A police officer has the duty not to ratify and effectuate a heckler’s veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect” persons exercising their constitutional rights. Glasson v. Louisville, 518 F.2d 899, 906 (6th Cir.1975) (citing Sellers v. Johnson, 163 F.2d 877 (8th Cir.1947)). I would deny the officers’ motion for qualified immunity because no reasonable officer could have concluded (before reading the court’s opinion today) that he could arrest a demonstrator because the offensiveness of a sign caused other citizens to become so emotional that they lost the ability to focus on the road and control their vehicles therefore “obstructing traffic.”
IY.
The court errs in three ways. First, this is not a captive-audience case. Second, a content-based distinction cannot be a “manner” restriction under the time, place, and manner test. And third, the secondary effects doctrine doesn’t apply here.
First, because this is not a captive-audience case, the court errs when it relies upon Hill to distinguish Cohen. In most situations, the government cannot silence speech to protect the listener from offensive messages. Cohen, 403 U.S. at 21, 91 S.Ct. 1780. The ability to silence is limited to situations in which the listener can show that he is a member of a captive audience; that is, his “substantial privacy interests are being invaded in an essentially intolerable manner.” Id. In Hill, the Court merely noted that the “recognizable privacy interest in avoiding unwanted communication varies widely in different settings.” Hill v. Colorado, 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Today, the court notes the existence of a busy intersection and the presence of large signs and moves on. I have no idea how these two factors affect the substantial-privacy-interest showing necessary to silence a speaker.
The captive-audience exception applies “where the degree of captivity makes it impractical for the unwilling viewer ... to avoid exposure.” Id. at 718, 120 S.Ct. 2480 (quotations omitted); Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). In Hill, the ordinance restricted no message. It restricted no signs. It silenced no speaker. The law had no impact on what a protestor could say or write on a sign while standing on the sidewalk. It prohibited approaching a patron to within eight feet of the patron’s body. By doing so it protected both the speaker’s and the listener’s interests: the speaker could still speak, but the approach restriction allowed the patron to avert her eyes. In this case, we had a stationary protest, in a public forum, where the willing drivers could join the protest (as one did) and the unwilling audience could simply look away. These sidewalk demonstrators held no passing drivers captive, so the drivers should have looked away and driven on instead of looking to the government to silence the demonstrators. Cohen, 403 U.S. at 21, 91 S.Ct. 1780.
Second, the court’s adroitly phrased time-place-and-manner discussion cannot hide the heckler’s veto. The court notes that “the police officers placed reasonable *797 restrictions on the location of the signs.” Ante at 790. Which signs? The complete sentence would read, “the police officers placed reasonable restrictions on the location of the signs that the passersby described as offensive and disgusting.” Such selective restrictions are not content-neutral manner restrictions.
Nor can the court justify the restriction as having only a secondary or “incidental” effect on expression. Id. We already rejected that approach in Lewis. Here, the “traffic obstruction” arose specifically from the passersb/s reactions. So “even if we assume that [the officers] made no judgment about the viewpoint of [the demonstrators’] speech,” we must reject the attempt to censor the speech based on the response of the passersby. Lewis, 253 F.3d at 1082.
V.
If signs create a visual distraction, a city can regulate, within limits, how close protestors can stand to the street. It can limit the size of signs. But it can’t choose which messages demonstrators can display near the street. It can’t limit which messages demonstrators can place on large signs. And police officers certainly cannot let citizens determine, under an offensiveness criteria, which demonstrators can protest where or through which means. Otherwise, the government “would effectively empower a majority to silence dissidents simply as a matter of personal predilections.” Cohen, 403 U.S. at 21, 91 S.Ct. 1780; see Appellants’ App. (Wranich Deposition) at 121 (“[T]hey could protest as long as they weren’t using the offensive signs.” We ordered them to remove “the offensive signs, the ones that the traveling public had complained about that were offensive.”) (emphasis added); Appellants’ App. at 113 (We told them we would arrest them “if they refused to put away the disturbing, graphic photos.”).
The First Amendment knew no heckler’s veto, before today. I respectfully dissent.

. The protestors deny that they or their signs were in the street. Because the officers moved for summary judgment, we must resolve this factual dispute in appellants' favor.

. Along with the drivers that the officers interviewed, two other people saw the appellants’ signs and pulled over. One woman actually joined the demonstration by holding a sign, and the other expressed interest in doing so. Neither individual testified that the roadway was obstructed.