## ·FORSYTH COUNTY, GEORGIA *v.* NATIONALIST MOVEMENT

No. 91–538.   Argued March 31, 1992—Decided June 19, 1992

BLACKMUN, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which WHITE, SCALIA, and THOMAS, JJ., joined, *post*, p. 137.

*Robert S. Stubbs III* argued the cause for petitioner. With him on the briefs was *Gordon A. Smith.*

*Richard Barrett* argued the cause and filed a brief for respondent.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case, with its emotional overtones, we must decide whether the free speech guarantees of the First and Fourteenth Amendments are violated by an assembly and parade ordinance that permits a government administrator to vary the fee for assembling or parading to reflect the estimated cost of maintaining public order.

## I

Petitioner Forsyth County is a primarily rural Georgia county approximately 30 miles northeast of Atlanta. It has

---

*Jody M. Litchford* filed a brief for the city of Orlando et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Eric Neisser, Steven R. Shapiro, John A. Powell,* and *Elliot M. Mincberg;* for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* and for Public Citizen by *David C. Vladeck* and *Alan B. Morrison.*

had a troubled racial history. In 1912, in one month, its entire African-American population, over 1,000 citizens, was driven systematically from the county in the wake of the rape and murder of a white woman and the lynching of her accused assailant.[1] Seventy-five years later, in 1987, the county population remained 99% white.[2]

Spurred by this history, Hosea Williams, an Atlanta city councilman and civil rights personality, proposed a Forsyth County "March Against Fear and Intimidation" for January 17, 1987. Approximately 90 civil rights demonstrators attempted to parade in Cumming, the county seat. The marchers were met by members of the Forsyth County Defense League (an independent affiliate of respondent, The Nationalist Movement), of the Ku Klux Klan, and other Cumming residents. In all, some 400 counterdemonstrators lined the parade route, shouting racial slurs. Eventually, the counterdemonstrators, dramatically outnumbering police officers, forced the parade to a premature halt by throwing rocks and beer bottles.

Williams planned a return march the following weekend. It developed into the largest civil rights demonstration in the South since the 1960's. On January 24, approximately 20,000 marchers joined civil rights leaders, United States Senators, Presidential candidates, and an Assistant United States Attorney General in a parade and rally.[3] The 1,000 counterdemonstrators on the parade route were contained

---

[1] The 1910 census counted 1,098 African-Americans in Forsyth County. U. S. Dept. of Commerce, Bureau of Census, Negro Population 1790–1915, p. 779 (1918). For a description of the 1912 events, see generally Hackworth, "Completing the Job" in Forsyth County, 8 Southern Exposure 26 (1980).

[2] See J. Clements, Georgia Facts 184 (1989); Hackworth, 8 Southern Exposure, at 26 ("[O]ther than an occasional delivery truck driver or visiting government official, there are currently no black faces anywhere in the county").

[3] See Chicago Tribune, Jan. 25, 1987, p. 1; Los Angeles Times, Jan. 25, 1987, p. 1, col. 2; App. to Pet. for Cert. 89–91.

by more than 3,000 state and local police and National Guardsmen. Although there was sporadic rock throwing and 60 counterdemonstrators were arrested, the parade was not interrupted. The demonstration cost over $670,000 in police protection, of which Forsyth County apparently paid a small portion.[4] See App. to Pet. for Cert. 75–94; Los Angeles Times, Jan. 28, 1987, Metro section, p. 5, col. 1.

"As a direct result" of these two demonstrations, the Forsyth County Board of Commissioners enacted Ordinance 34 on January 27, 1987. See Brief for Petitioner 6. The ordinance recites that it is "to provide for the issuance of permits for parades, assemblies, demonstrations, road closings, and other uses of public property and roads by private organizations and groups of private persons for private purposes." See App. to Pet. for Cert. 98. The board of commissioners justified the ordinance by explaining that "the cost of necessary and reasonable protection of persons participating in or observing said parades, assemblies, demonstrations, road closings and other related activities exceeds the usual and normal cost of law enforcement for which those participating should be held accountable and responsible." *Id.*, at 100. The ordinance required the permit applicant to defray these costs by paying a fee, the amount of which was to be fixed "from time to time" by the Board. *Id.*, at 105.

Ordinance 34 was amended on June 8, 1987, to provide that every permit applicant " 'shall pay in advance for such permit, for the use of the County, a sum not more than $1,000.00 for each day such parade, procession, or open air public meeting shall take place.' " *Id.*, at 119.[5] In addition, the county

---

[4] Petitioner Forsyth County does not indicate what portion of these costs it paid. Newspaper articles reported that the State of Georgia paid an estimated $579,148. Other government entities paid an additional $29,759. Figures were not available for the portion paid by the city of Atlanta for the police it sent. See *id.*, at 95–97.

[5] The ordinance was amended at other times, too, but those amendments are not under challenge here.

administrator was empowered to "'adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed.'" *Ibid.*

In January 1989, respondent The Nationalist Movement proposed to demonstrate in opposition to the federal holiday commemorating the birthday of Martin Luther King, Jr. In Forsyth County, the Movement sought to "conduct a rally and speeches for one and a half to two hours" on the courthouse steps on a Saturday afternoon. *Nationalist Movement* v. *City of Cumming*, 913 F. 2d 885, 887 (CA11 1990).[6] The county imposed a $100 fee. The fee did not include any calculation for expenses incurred by law enforcement authorities, but was based on 10 hours of the county administrator's time in issuing the permit. The county administrator testified that the cost of his time was deliberately undervalued and that he did not charge for the clerical support involved in processing the application. Tr. 135–139.

The Movement did not pay the fee and did not hold the rally. Instead, it instituted this action on January 19, 1989, in the United States District Court for the Northern District of Georgia, requesting a temporary restraining order and permanent injunction prohibiting Forsyth County from interfering with the Movement's plans.

The District Court denied the temporary restraining order and injunction. It found that, although "the instant ordinance vests much discretion in the County Administrator in determining an appropriate fee," the determination of the fee was "based solely upon content-neutral criteria; namely,

---

[6] The demonstration proposed was to consist of assembling at the Forsyth County High School, marching down a public street in Cumming to the courthouse square, and there conducting a rally. Only the rally was to take place on property under the jurisdiction of the county. The parade and assembly required permits from the city of Cumming and the Forsyth County Board of Education. Their permit schemes are not challenged here.

the actual costs incurred investigating and processing the application." App. to Pet. for Cert. 13–14. Although it expressed doubt about the constitutionality of that portion of the ordinance that permits fees to be based upon the costs incident to maintaining public order, the District Court found that "the county ordinance, as applied in this case, is not unconstitutional." *Id.*, at 14.

The United States Court of Appeals for the Eleventh Circuit reversed this aspect of the District Court's judgment. *Nationalist Movement* v. *City of Cumming*, 913 F. 2d 885 (1990). Relying on its prior opinion in *Central Florida Nuclear Freeze Campaign* v. *Walsh*, 774 F. 2d 1515, 1521 (CA11 1985), cert. denied, 475 U. S. 1120 (1986), the Court of Appeals held: "An ordinance which charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment." 913 F. 2d, at 891 (internal quotation marks omitted). The court determined that a permit fee of up to $1,000 a day exceeded this constitutional threshold. *Ibid.* One judge concurred specially, calling for *Central Florida* to be overruled. 913 F. 2d, at 896.

The Court of Appeals then voted to vacate the panel's opinion and to rehear the case en banc. 921 F. 2d 1125 (1990). After further briefing, the court issued a *per curiam* opinion reinstating the panel opinion in its entirety. 934 F. 2d 1482, 1483 (1991). Two judges, concurring in part and dissenting in part, agreed that any fee imposed on the exercise of First Amendment rights in a traditional public forum must be nominal if it is to survive constitutional scrutiny. Those judges, however, did not believe that the county ordinance swept so broadly that it was facially invalid, and would have remanded the case for the District Court to determine whether the fee was nominal.[7] *Ibid.* Three judges

---

[7] These judges also found that the ordinance contained sufficiently tailored standards for the administrator to use in reviewing permit applications. 934 F. 2d 1482, 1487–1489 (1991). This issue was raised by respondent, but the panel did not reach it.

dissented, arguing that this Court's cases do not require that fees be nominal. *Id.*, at 1493.

We granted certiorari to resolve a conflict among the Courts of Appeals concerning the constitutionality of charging a fee for a speaker in a public forum.[8] 502 U. S. 1023 (1991).

## II

Respondent mounts a facial challenge to the Forsyth County ordinance. It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable. See, *e. g., City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 798–799, and n. 15 (1984); *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 574 (1987). This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. See, *e. g., New York* v. *Ferber*, 458 U. S. 747, 772 (1982); *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 503 (1985). Thus, the Court has permitted a party to challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, see *Thornhill* v. *Ala-*

---

[8] Compare the Eleventh Circuit's opinions in this litigation, 913 F. 2d 885, 891 (1990), and 934 F. 2d 1482, 1483 (1991), with *Stonewall Union* v. *Columbus*, 931 F. 2d 1130, 1136 (CA6) (permitting greater than nominal fees that are reasonably related to expenses incident to the preservation of public safety and order), cert. denied, 502 U. S. 899 (1991); *Eastern Conn. Citizens Action Group* v. *Powers*, 723 F. 2d 1050, 1056 (CA2 1983) (licensing fees permissible only to offset expenses associated with processing applications for public property); *Fernandes* v. *Limmer*, 663 F. 2d 619, 632–633 (CA5 1981) ($6 flat fee for permit was unconstitutional), cert. dism'd, 458 U. S. 1124 (1982).

*bama,* 310 U. S. 88, 97 (1940); *Freedman* v. *Maryland,* 380 U. S. 51, 56 (1965); *Taxpayers for Vincent,* 466 U. S., at 798, n. 15, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected, see *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973); *Jews for Jesus,* 482 U. S., at 574–575.

The Forsyth County ordinance requiring a permit and a fee before authorizing public speaking, parades, or assemblies in "the archetype of a traditional public forum," *Frisby* v. *Schultz,* 487 U. S. 474, 480 (1988), is a prior restraint on speech, see *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969); *Niemotko* v. *Maryland,* 340 U. S. 268, 271 (1951). Although there is a "heavy presumption" against the validity of a prior restraint, *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963), the Court has recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally, see *Cox* v. *New Hampshire,* 312 U. S. 569, 574–576 (1941). Such a scheme, however, must meet certain constitutional requirements. It may not delegate overly broad licensing discretion to a government official. See *Freedman* v. *Maryland, supra.* Further, any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication. See *United States* v. *Grace,* 461 U. S. 171, 177 (1983).

### A

Respondent contends that the county ordinance is facially invalid because it does not prescribe adequate standards for the administrator to apply when he sets a permit fee. A government regulation that allows arbitrary application is "inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view."

*Heffron* v. *International Society for Krishna Conscious-
ness, Inc.,* 452 U. S. 640, 649 (1981). To curtail that risk, "a
law subjecting the exercise of First Amendment freedoms to
the prior restraint of a license" must contain "narrow, objec-
tive, and definite standards to guide the licensing authority."
*Shuttlesworth,* 394 U. S., at 150–151; see also *Niemotko,* 340
U. S., at 271. The reasoning is simple: If the permit scheme
"involves appraisal of facts, the exercise of judgment, and
the formation of an opinion," *Cantwell* v. *Connecticut,* 310
U. S. 296, 305 (1940), by the licensing authority, "the danger
of censorship and of abridgment of our precious First
Amendment freedoms is too great" to be permitted, *South-
eastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 553 (1975).

In evaluating respondent's facial challenge, we must con-
sider the county's authoritative constructions of the ordi-
nance, including its own implementation and interpretation
of it. See *Ward* v. *Rock Against Racism,* 491 U. S. 781, 795–
796 (1989); *Lakewood* v. *Plain Dealer Publishing Co.,* 486
U. S. 750, 770, n. 11 (1988); *Gooding* v. *Wilson,* 405 U. S. 518,
524–528 (1972). In the present litigation, the county has
made clear how it interprets and implements the ordinance.
The ordinance can apply to any activity on public property—
from parades, to street corner speeches, to bike races—and
the fee assessed may reflect the county's police and adminis-
trative costs. Whether or not, in any given instance, the fee
would include any or all of the county's administrative and
security expenses is decided by the county administrator.[9]

---

[9] In pertinent part, the ordinance, as amended, states that the adminis-
trator "*shall* adjust the amount to be paid in order to meet the expense
incident to the administration of the Ordinance and to the maintenance of
public order." §3(6) (emphasis added), App. to Pet. for Cert. 119. This
could suggest that the administrator has no authority to reduce or waive
these expenses. It has not been so understood, however, by the county.
See 934 F. 2d, at 1488, n. 12 (opinion concurring in part and dissenting in
part). In its February 23, 1987, amendments to the ordinance, the board
of commissioners changed the permit form from "Have you paid *the* ap-
plication fee?" to "Have you paid *any* application fee?," see App. to

In this case, according to testimony at the District Court hearing, the administrator based the fee on his own judgment of what would be reasonable. Although the county paid for clerical support and staff as an "expense incident to the administration" of the permit, the administrator testified that he chose in this instance not to include that expense in the fee. The administrator also attested that he had deliberately kept the fee low by undervaluing the cost of the time he spent processing the application. Even if he had spent more time on the project, he claimed, he would not have charged more. He further testified that, in this instance, he chose not to include any charge for expected security expense. Tr. 135–139.

The administrator also explained that the county had imposed a fee pursuant to a permit on two prior occasions. The year before, the administrator had assessed a fee of $100 for a permit for the Movement. The administrator testified that he charged the same fee the following year (the year in question here), although he did not state that the Movement was seeking the same use of county property or that it required the same amount of administrative time to process. *Id.*, at 138. The administrator also once charged bike-race organizers $25 to hold a race on county roads, but he did not explain why processing a bike-race permit demanded less administrative time than processing a parade permit or why he had chosen to assess $25 in that instance. *Id.*, at 143–144. At oral argument in this Court, counsel for Forsyth County stated that the administrator had levied a $5 fee on the Girl Scouts *for an activity on county property.* Tr. of Oral Arg. 26. Finally, the administrator testified that in other cases the county required neither a permit nor a fee for activities in other county facilities or on county land. Tr. 146.

Based on the county's implementation and construction of the ordinance, it simply cannot be said that there are any

---

Pet. for Cert. 115 (emphasis added), thus acknowledging the administrator's authority to charge no fee.

"narrowly drawn, reasonable and definite standards," *Niemotko*, 340 U. S., at 271, guiding the hand of the Forsyth County administrator. The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees.[10] The First Amendment prohibits the vesting of such unbridled discretion in a government official.[11]

## B

The Forsyth County ordinance contains more than the possibility of censorship through uncontrolled discretion. As

---

[10] The District Court's finding that in this instance the Forsyth County administrator applied legitimate, content-neutral criteria, even if correct, is irrelevant to this facial challenge. Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision. See *Lakewood* v. *Plain Dealer Publishing Co.*, 486 U. S. 750, 770 (1988). "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill* v. *Alabama*, 310 U. S. 88, 97 (1940). Accordingly, the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.

[11] Petitioner also claims that *Cox* v. *New Hampshire*, 312 U. S. 569 (1941), excuses the administrator's discretion in setting the fee. Reliance on *Cox* is misplaced. Although the discretion granted to the administrator under the language in this ordinance is the same as in the statute at issue in *Cox*, the interpretation and application of that language are different. Unlike this case, there was in *Cox* no testimony or evidence that the statute granted unfettered discretion to the licensing authority. *Id.*, at 576–577.

construed by the county, the ordinance often requires that the fee be based on the content of the speech.

The county envisions that the administrator, in appropriate instances, will assess a fee to cover "the cost of necessary and reasonable protection of persons participating in or observing said . . . activit[y]." See App. to Pet. for Cert. 100. In order to assess accurately the cost of security for parade participants, the administrator " 'must necessarily examine the content of the message that is conveyed,'" *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221, 230 (1987), quoting *FCC* v. *League of Women Voters of Cal.,* 468 U. S. 364, 383 (1984), estimate the response of others to that content, and judge the number of police necessary to meet that response. The fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit.

Although petitioner agrees that the cost of policing relates to content, see Tr. of Oral Arg. 15 and 24, it contends that the ordinance is content neutral because it is aimed only at a secondary effect—the cost of maintaining public order. It is clear, however, that, in this case, it cannot be said that the fee's justification " 'ha[s] nothing to do with content.'" *Ward,* 491 U. S., at 792, quoting *Boos* v. *Barry,* 485 U. S. 312, 320 (1988) (opinion of O'CONNOR, J.).

The costs to which petitioner refers are those associated with the public's reaction to the speech. Listeners' reaction to speech is not a content-neutral basis for regulation. See *id.,* at 321 (opinion of O'CONNOR, J.); *id.,* at 334 (opinion of Brennan, J.); *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46, 55–56 (1988); *Murdock* v. *Pennsylvania,* 319 U. S. 105, 116 (1943); cf. *Schneider* v. *State (Town of Irvington),* 308 U. S. 147, 162 (1939) (fact that city is financially burdened when listeners throw leaflets on the street does not justify restriction on distribution of leaflets). Speech cannot be financially

burdened, any more than it can be punished or banned, simply because it might offend a hostile mob.[12]   See *Gooding* v. *Wilson*, 405 U. S. 518 (1972); *Terminiello* v. *Chicago*, 337 U. S. 1 (1949).

This Court has held time and again: "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan* v. *Time, Inc.*, 468 U. S. 641, 648–649 (1984); *Simon & Schuster, Inc.* v. *Member of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991); *Arkansas Writers' Project*, 481 U. S., at 230.   The county offers only one

---

[12] The dissent prefers a remand because there are no lower court findings on the question whether the county plans to base parade fees on hostile crowds.   See *post*, at 142.   We disagree.   A remand is unnecessary because there is no question that petitioner intends the ordinance to recoup costs that are related to listeners' reaction to the speech.   Petitioner readily admits it did not charge for police protection for the 4th of July parades, although they were substantial parades, which required the closing of streets and drew large crowds.   Petitioner imposed a fee only when it became necessary to provide security for parade participants from angry crowds opposing their message.   Brief for Petitioner 6.   The ordinance itself makes plain that the costs at issue are those needed for "necessary and reasonable protection of persons participating in or observing" the speech.   See App. to Pet. for Cert. 100.   Repayment for police protection is the "[m]ost importan[t]" purpose underlying the ordinance.   Brief for Petitioner 6–7.

In this Court, petitioner specifically urges reversal because the lower court has "taken away the right of local government to obtain reimbursement for administration and *policing costs which are incurred in protecting those using government property for expression.*"   *Id.*, at 17 (emphasis added).   When directly faced with the Court of Appeals' concern about "the enhanced cost associated with policing expressive activity which would generate potentially violent reactions," *id.*, at 36, petitioner responded not by arguing that it did not intend to charge for police protection, but that such a charge was permissible because the ordinance provided a cap.   See *id.*, at 36–37; Tr. of Oral Arg. 24.   At no point, in any level of proceedings, has petitioner intimated that it did not construe the ordinance consistent with its language permitting fees to be charged for the cost of police protection from hostile crowds.   We find no disputed interpretation of the ordinance necessitating a remand.

justification for this ordinance: raising revenue for police services. While this undoubtedly is an important government responsibility, it does not justify a content-based permit fee. See *id.*, at 229–231.

Petitioner insists that its ordinance cannot be unconstitutionally content based because it contains much of the same language as did the state statute upheld in *Cox* v. *New Hampshire*, 312 U. S. 569 (1941). Although the Supreme Court of New Hampshire had interpreted the statute at issue in *Cox* to authorize the municipality to charge a permit fee for the "maintenance of public order," no fee was actually assessed. See *id.*, at 577. Nothing in this Court's opinion suggests that the statute, as interpreted by the New Hampshire Supreme Court, called for charging a premium in the case of a controversial political message delivered before a hostile audience. In light of the Court's subsequent First Amendment jurisprudence, we do not read *Cox* to permit such a premium.

## C

Petitioner, as well as the Court of Appeals and the District Court, all rely on the maximum allowable fee as the touchstone of constitutionality. Petitioner contends that the $1,000 cap on the fee ensures that the ordinance will not result in content-based discrimination. The ordinance was found unconstitutional by the Court of Appeals because the $1,000 cap was not sufficiently low to be "nominal." Neither the $1,000 cap on the fee charged, nor even some lower nominal cap, could save the ordinance because in this context, the level of the fee is irrelevant. A tax based on the content of speech does not become more constitutional because it is a small tax.

The lower courts derived their requirement that the permit fee be "nominal" from a sentence in the opinion in *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). In *Murdock*, the Court invalidated a flat license fee levied on distributors of religious literature. In distinguishing the case from *Cox*,

where the Court upheld a permit fee, the Court stated: "And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." 319 U. S., at 116. This sentence does not mean that an invalid fee can be saved if it is nominal, or that only nominal charges are constitutionally permissible. It reflects merely one distinction between the facts in *Murdock* and those in *Cox*.

The tax at issue in *Murdock* was invalid because it was unrelated to any legitimate state interest, not because it was of a particular size. Similarly, the provision of the Forsyth County ordinance relating to fees is invalid because it unconstitutionally ties the amount of the fee to the content of the speech and lacks adequate procedural safeguards; no limit on such a fee can remedy these constitutional violations.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

We granted certiorari in this case to consider the following question:

"Whether the provisions of the First Amendment to the United States Constitution limit the amount of a license fee assessed pursuant to the provisions of a county parade ordinance to a nominal sum or whether the amount of the license fee may take into account the actual expense incident to the administration of the ordinance and the maintenance of public order in the matter licensed, up to the sum of $1,000.00 per day of the activity." Pet. for Cert. i.

The Court's discussion of this question is limited to an ambiguous and noncommittal paragraph toward the very end of the opinion. *Supra* this page. The rest of the opinion

takes up and decides other perceived unconstitutional de-
fects in the Forsyth County ordinance.   None of these claims
were passed upon by the Court of Appeals; that court de-
cided only that the First Amendment forbade the charging
of more than a nominal fee for a permit to parade on public
streets.   Since that was the question decided by the Court
of Appeals below, the question which divides the Courts of
Appeals, and the question presented in the petition for cer-
tiorari, one would have thought that the Court would at least
authoritatively decide, if not limit itself to, that question.

## I

The answer to this question seems to me quite simple, be-
cause it was authoritatively decided by this Court more than
half a century ago in *Cox* v. *New Hampshire*, 312 U. S. 569
(1941).   There we confronted a state statute which required
payment of a license fee of up to $300 to local governments
for the right to parade in the public streets.   The Supreme
Court of New Hampshire had construed the provision as re-
quiring that the amount of the fee be adjusted based on the
size of the parade, as the fee "for a circus parade or a celebra-
tion procession of length, each drawing crowds of observers,
would take into account the greater public expense of polic-
ing the spectacle, compared with the slight expense of a less
expansive and attractive parade or procession."   *Id.*, at 577
(internal quotation marks omitted).   Under the state court's
construction, the fee provision was "not a revenue tax, but
one to meet the expense incident to the administration of the
Act and to the maintenance of public order in the matter
licensed."   *Ibid.* (internal quotation marks omitted).   This
Court, in a unanimous opinion by Chief Justice Hughes, up-
held the statute, saying:

> "There is nothing contrary to the Constitution in the
> charge of a fee limited to the purpose stated.   The sug-
> gestion that a flat fee should have been charged fails to
> take account of the difficulty of framing a fair schedule

to meet all circumstances, and we perceive no constitutional ground for denying to local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought.

"There is no evidence that the statute has been administered otherwise than in the fair and nondiscriminatory manner which the state court has construed it to require." *Ibid.*

Two years later, in *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943), this Court confronted a municipal ordinance that required payment of a flat license fee for the privilege of canvassing door-to-door to sell one's wares. Pursuant to that ordinance, the city had levied the flat fee on a group of Jehovah's Witnesses who sought to distribute religious literature door-to-door for a small price. *Id.,* at 106–107. The Court held that the flat license tax, as applied against the hand distribution of religious tracts, was unconstitutional on the ground that it was "a flat tax imposed on the exercise of a privilege granted by the Bill of Rights." *Id.,* at 113. In making this ruling, the Court distinguished *Cox* by stating that "the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." 319 U. S., at 116. This language, which suggested that the fee involved in *Cox* was only nominal, led the Court of Appeals for the Eleventh Circuit in the present case to conclude that a city is prohibited from charging any more than a nominal fee for a parade permit. 913 F. 2d 885, 890–891, and n. 6 (1990). But the clear holding of *Cox* is to the contrary. In that case, the Court expressly recognized that the New Hampshire state statute allowed a city to levy much more than a nominal parade fee, as it stated that the fee provision "had a permissible range from $300 to a nominal amount." *Cox* v. *New Hampshire, supra,* at 576. The use of the word "nominal" in *Murdock* was thus unfortunate, as

it represented a mistaken characterization of the fee statute in *Cox*. But a mistaken allusion in a later case to the facts of an earlier case does not by itself undermine the holding of the earlier case. The situations in *Cox* and *Murdock* were clearly different; the first involved a sliding fee to account for administrative and security costs incurred as a result of a parade on public property, while the second involved a flat tax on protected religious expression. I believe that the decision in *Cox* squarely controls the disposition of the question presented in this case, and I therefore would explicitly hold that the Constitution does not limit a parade license fee to a nominal amount.

## II

Instead of deciding the particular question on which we granted certiorari, the Court concludes that the county ordinance is facially unconstitutional because it places too much discretion in the hands of the county administrator and forces parade participants to pay for the cost of controlling those who might oppose their speech. *Ante,* at 130–137. But, because the lower courts did not pass on these issues, the Court is forced to rely on its own interpretation of the ordinance in making these rulings. The Court unnecessarily reaches out to interpret the ordinance on its own at this stage, even though there are no lower court factual findings on the scope or administration of the ordinance. Because there are no such factual findings, I would not decide at this point whether the ordinance fails for lack of adequate standards to guide discretion or for incorporation of a "heckler's veto," but would instead remand the case to the lower courts to initially consider these issues.

The Court first finds fault with the alleged standardless discretion possessed by the county administrator. The ordinance provides that the administrator "shall adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." App. to Pet. for

Cert. 119. In this regard, the ordinance clearly parallels the construction of the statute we upheld in *Cox*. 312 U. S., at 577 (statute did not impose "a revenue tax, but one to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed" (internal quotation marks omitted)). The Court worries, however, about the possibility that the administrator has the discretion to set fees based upon his approval of the message sought to be conveyed, and concludes that "the county's authoritative constructio[n] of the ordinance" allows for such a possibility. *Ante*, at 131. The Court apparently envisions a situation where the administrator would impose a $1,000 parade fee on a group whose message he opposed, but would waive the fee entirely for a similarly situated group with whom he agreed. But the county has never rendered any "authoritative construction" indicating that officials have "unbridled discretion," *ante*, at 133, in setting parade fees, nor has any lower court so found. In making its own factual finding that the ordinance does allow for standardless fee setting, this Court simply cites four situations in which the administrator set permit fees—two fees of $100, one of $25, and one of $5. *Ante*, at 132. On the basis of this evidence, the Court finds that the administrator has unbridled discretion to set permit fees. The mere fact that the permit fees differed in amount does not invalidate the ordinance, however, as our decision in *Cox* clearly allows a governmental entity to adopt an adjustable permit fee scheme. See *Cox* v. *New Hampshire, supra,* at 577 ("[W]e perceive no constitutional ground for denying to local governments th[e] flexibility of adjustment of fees"). It is true that the Constitution does not permit a system in which the county administrator may vary fees at his pleasure, but there has been no lower court finding that that is what this fledgling ordinance creates. And, given the opportunity, the District Court might find that the county has a policy that precludes the administrator from arbitrarily imposing fees. Of course, the District

Court might find that the administrator does possess too much discretion. In either case, I believe findings by the District Court on the issue would be preferable.

The Court relies on *Ward* v. *Rock Against Racism*, 491 U. S. 781, 795–796 (1989), for the proposition that the county's interpretation of the ordinance must be considered. In that case, however, we relied upon District Court findings concerning New York City's limiting interpretation of a noise regulation. *Id.*, at 795. I would prefer to remand this case so that the Court might rely on such express findings here as well.

The Court's second reason for invalidating the ordinance is its belief that any fee imposed will be based in part on the cost of security necessary to control those who *oppose* the message endorsed by those marching in a parade. Assuming 100 people march in a parade and 10,000 line the route in protest, for example, the Court worries that, under this ordinance, the county will charge a premium to control the hostile crowd of 10,000, resulting in the kind of "heckler's veto" we have previously condemned. *Ante*, at 133–136. But there have been no lower court findings on the question whether or not the county plans to base parade fees on anticipated hostile crowds. It has not done so in any of the instances where it has so far imposed fees. *Ante*, at 132. And it most certainly did not do so in this case. The District Court below noted that:

> "[T]he instant ordinance alternatively permits fees to be assessed based upon 'the expense incident to . . . the maintenance of public order.' If the county had applied this portion of the statute, the phrase might run afoul of . . . constitutional concerns. . . .
>
> "However, in the instant case, plaintiff did not base their *[sic]* argument upon this phrase, but contended that the mere fact that a $100 fee was imposed is unconstitutional, especially in light of the organization's financial circumstances. *The evidence was clear that the*

*fee was based solely upon the costs of processing the application and plaintiff produced no evidence to the contrary.*"   App. to Pet. for Cert. 14 (emphasis added).

The Court's analysis on this issue rests on an assumption that the county will interpret the phrase "maintenance of public order" to support the imposition of fees based on opposition crowds.   There is nothing in the record to support this assumption, however, and I would remand for a hearing on this question.

For the foregoing reasons, I dissent.