JUSTICE NELSON
concurs and dissents.
¶49 I concur in the Court’s resolution of Issue One. I dissent with regard to Issue Two. As for Issue Three, I agree that the Newspaper is entitled to recover attorney fees incurred in securing the unredacted reports. However, given my conclusion as to Issue Two, I would remand for consideration of an award of additional attorney fees, pursuant to § 2-3-221, MCA, following proper resolution of the Newspaper’s *353 remaining claim.
¶50 As for Issue two, I do not agree with the Court’s conclusion that this claim is not ripe for adjudication. In my view, the Court’s analysis is based on a flawed premise. Given its ongoing interest in obtaining initial incident reports to determine whether they contain newsworthy information, the Newspaper sought a remedy to the Police Department’s failure to follow systematic procedures in accommodating the public’s right to know. The Court characterizes this claim as a “request for prospective relief’ and, on that basis, proceeds to conclude that the claim is not ripe for adjudication. I disagree with this characterization.
¶51 I conclude that the Newspaper’s claim is a request for instant relief. The Court states that the Newspaper’s request for “prospective relief’ amounts to “a request for relief from a purely hypothetical future violation of its right to know.” This statement is wholly inaccurate. The Newspaper seeks relief not from a “purely hypothetical future violation,” but from a real, presently existing, and readily identifiable problem which implicates the public’s right to know-i.e., the Police Department’s lack of procedures governing its decisions to withhold information contained in initial incident reports. Addressing this claim plainly does not require “prospective adjudication” or an evaluation of specific factual scenarios which are not presently before us, as the Court asserts. The Court further mischaracterizes the claim at issue here by suggesting that the Newspaper asks us to balance the public’s right to know against an individual privacy interest in a hypothetical future case.
¶52 Because the implementation of a policy would likely preclude or resolve some future conflicts, the Newspaper’s claim may, in part, be properly characterized as a request for prospective relief. However, it is plainly wrong to characterize the entire claim in this manner. The problem identified is one that exists presently, and the relief sought would immediately change the way the Police Department handles this kind of request. Thus, the Court’s blanket characterization ignores the immediate nature of both the problem identified by the Newspaper and the relief requested.
¶53 Moreover, the Court misconceives the nature of this appeal in stating at the outset that the “focus of this dispute is a police report.” Similarly, the Court also states that “the challenged” conduct in this case is “redacting portions of these particular Reports.” Access to the redacted information was an issue in the proceedings below when the Newspaper sought to obtain the full Reports. However, Havre has since disclosed the full text of the Reports, albeit belatedly. Accordingly, the *354 Newspaper’s claim for the release of the unredacted Reports is moot.
¶54 Neither party disputes the fact that the Newspaper’s claim of entitlement to the unredacted Reports is moot. Nonetheless, this Court devotes nearly ten pages of mootness analysis to “the Newspaper’s claim that Havre illegally denied access to the unredacted Reports.” And for what? To simply conclude that the Newspaper’s claim for “the release of the Reports was mooted by the Havre Daily News’s receipt of the unredacted Reports.” This analysis is wholly unnecessary given that neither party contests this issue or presents it for our review. Thus, the majority here renders an advisory opinion-something which we have unequivocally stated that we will not do. Ingraham v. State (1997), 284 Mont. 481, 487, 945 P.2d 19, 23 (citing State ex rel. Fletcher v. District Court (1993), 260 Mont. 410, 419, 859 P.2d 992, 997).
¶55 The particular documents which the Newspaper sought are simply not an issue here, much less the “focus” of this dispute. The real issue on appeal is whether the District Court properly granted summary judgment on the Newspaper’s remaining claim.
¶56 The Newspaper’s Complaint contains two distinct claims. Besides seeking the unredacted Reports, the Newspaper recognized a larger problem at the outset of this case-the state of affairs in which the public is forced to file suit in order to exercise its constitutional right to know. Upon this recognition, and given its ongoing interest in obtaining initial incident reports to determine whether they contain newsworthy information, the Newspaper sought a remedy to the Police Department’s failure to follow systematic procedures in determining whether to withhold incident reports from the public.
¶57 Specifically, the Complaint contained, inter alia, the following allegations: (1) that Lt. George Tate initially allowed Winderl to view an unredacted copy of the Reports; (2) that Lt. Tate then vacillated, signaling that he was reluctant to release the entirety of the documents to Winderl because it included the names of individuals who were not charged; (3) that Winderl contacted Lt. Tate later that day, at which time Lt. Tate said he was “uncomfortable” providing a copy of the Reports without discussing the issue with his superior officers; (4) that Winderl was eventually provided with a copy of the Reports, with certain material redacted, including all references to Police Chief Kevin Olson and his daughter; and (5) that Winderl had, in the past, sought to access incident reports by asking low ranking officers, receptionists, and dispatchers at the Police Department, that these individuals would not provide access to the reports, and that they had referred Winderl to a high ranking officer. The Complaint also alleged that the Police Department charged Winderl three dollars to obtain the redacted copy, *355 and that this charge exceeded the cost of creating the copy.
¶58 As a legal basis for the Complaint, the Newspaper asserted, inter alia, that the Montana Constitution requires that public documents be made available at a cost adequate to cover only the expense of making the copy, and that Montana law requires government agencies to implement policies and procedures which guarantee the public’s exercise of its right to know.
¶59 Upon these allegations, the Newspaper sought implementation of a policy requiring: (1) that the Police Department “provide complete copies of all initial incident reports to the public during regular business hours upon demand by the public”; (2) that initial incident reports include a number of specific items, including personal information regarding the accused and any witnesses; and (3) that the Police Department provide copies of initial incident reports and attachments “at a cost not to exceed the actual cost of reproducing the copy regardless of the form the report or attachments are in.”[1]
¶60 The Court considers the Newspaper’s pleadings an “untenable” request that “governmental agencies provide unredacted copies on demand.” I disagree. All pleadings must be construed so as to do substantial justice. Rule 8(f), M.R.Civ.P. In assessing complaints, we “ ‘look to the claim as a whole, to the subject with which it deals, to the reason and spirit of the allegations in ascertaining its real purpose. If such purpose can reasonably be said to be within the scope of the language used, that purpose should be honored.’ ” School Trust v. State ex rel. Bd. of Comm’rs, 1999 MT 263, ¶ 29, 296 Mont. 402, ¶ 29, 989 P.2d 800, ¶ 29 (quoting Miller v. Titeca (1981), 192 Mont. 357, 364, 628 P.2d 670, 675). Moreover, “[i]t is always to be presumed that no absurd or unreasonable result was intended by the complainant.” Hidden Hollow Ranch v. Collins (1965), 146 Mont. 321, 326, 406 P.2d 365, 367-68.
¶61 The subject of the Complaint is not only the Police Department’s refusal to disclose the full text of the Reports, but also the Department’s lack of systematic procedures in responding to the Newspaper’s requests. The spirit of the allegations is that the Police Department’s shortcomings in this regard hinder the public’s exercise of its right to *356 know. Viewing the Newspaper’s Complaint as a whole, its purpose is clear — it seeks remedial implementation of a policy to facilitate the public’s exercise of its right to know in a systematic, consistent, and expedient manner.
¶62 It is equally clear that the Complaint is not without its shortcomings. The Newspaper’s request that “complete copies of all initial incident reports” be available on demand, standing alone, obviously conflicts with the exception contained in Article II, Section 9-i.e., that the public may properly be denied access to government documents when “the demand of individual privacy clearly exceeds the merits of public disclosure.” Reading this portion of the Complaint in isolation, as the Court apparently does here, one might conclude that the Newspaper advocates a policy which ignores the constitutional exception for individual privacy. Of course, as the Court notes, “a requirement that governmental agencies provide unredacted copies on demand is untenable.” Yet, the Newspaper also explicitly acknowledged the exception for individual privacy earlier in the Complaint. Given this acknowledgment, and given that we do not assume a party intends absurd or unreasonable results by a complaint, Hidden Hollow Ranch, 146 Mont. at 326, 406 P.2d at 367-68, it is fair to characterize the Newspaper’s Complaint, in its totality, as a request for the implementation of a policy in conformity with Article II, Section 9, of the Montana Constitution.
¶63 The Court characterizes this interpretation as a “creative endeavor” which produces a “strained reformation” of the Newspaper’s Complaint.[2] In reality, this interpretation merely conforms to longstanding precedent. The law mandates that we not construe Complaints strictly, as if interpreting a plainly worded statute. See School Trust, ¶ 29. Rather, as noted above, it is well established that we look to “‘the reason and spirit of the allegations in ascertaining its real purpose.’” School Trust, ¶ 29. In doing so, we are to honor the purpose evident in the pleadings. School Trust, ¶ 29. Accordingly, my interpretation of the Complaint is not a “strained reformation,” as the majority asserts; *357 rather, it merely honors the purpose made evident by the pleadings. In my view, the Court ignores the longstanding rule which requires broad interpretation of complaints.
¶64 Additionally, the Court states, without citing authority, that “[t]he mere absence of a policy governing dissemination of documents does not ripen into a violation of the constitutional right to know unless and until an identifiable person is actually denied access to a particular document....” Here, the Newspaper was denied access to a particular document. Consequently, it filed suit to obtain the documents and press for the implementation of a policy. Yet, the Court concludes that the Newspaper may not pursue its claim for the implementation of a policy because the claim now lacks a “concrete factual basis.” In so concluding, however, the Court fails to explain how this claim has become “wholly divorced” from the Police Department’s undisputed violation of the public’s right to know. There is simply no basis for concluding that this claim for the implementation of a policy has lost its connection with the Newspaper’s underlying claim for disclosure of the unredacted Reports.
¶65 And, if a clear violation of the right to know by a government agency does not entitle the public to challenge the agency’s failure to implement a policy, what does? How will a member of the public ever be able to challenge a government agency’s failure in this regard if the Court insists that such a claim is a request for “prospective” relief?
¶66 Apparently the Court has concluded that the public may seek disclosure of particular documents, but may not, in cases such as this one, assert a claim for the implementation of a policy. The Court’s reasoning effectively precludes the public from ever challenging a government agency’s failure to implement a policy as long as the defendant agency discloses the particular information sought prior to adjudication (an act which now apparently removes any “concrete factual basis” from the complaint). I find this approach entirely unjustifiable.
¶67 Finally, I am troubled that the Court so readily disregards the Newspaper’s claim for the implementation of a policy, as this request goes straight to the heart of the problem at issue-i.e., the government’s proven tendency to disregard the public’s right to know, which leads to lawsuits that needlessly consume public funds and judicial resources.
¶68 Article II, Section 9, of the Montana Constitution provides that the public’s opportunity to examine government documents is a part of the right to know. As this right is contained in the Montana Constitution’s Declaration of Rights, it is a fundamental right. State v. Tapson, 2001 MT 292, ¶ 15, 307 Mont. 428, ¶ 15, 41 P.3d 305, ¶ 15. In interpreting Section 9, we have held that there is a constitutional presumption that *358 all documents of every kind in the hands of public officials are amenable to inspection. Great Falls Tribune v. Mont. Public Service Comm’n, 2003 MT 359, ¶ 54, 319 Mont. 38, ¶ 54, 82 P.3d 876, ¶ 54. Additionally, we have held that this right to examine government documents, together with the public’s right of participation as provided for in Section 8 of Article II,[3] imposes “an ‘affirmative’ duty on government officials to make all of their records and proceedings available to public scrutiny.” Great Falls Tribune, ¶ 54.
¶69 The Court suggests that the presumption of openness may be limited to cases involving “the rights of corporate entities” because Great Falls Tribune “only involved the rights of corporate entities, rather than the rights of private individuals.” However, we have never limited the presumption in this way and it is truly frightening that we would do so here by way of dictum. Our articulation of the presumption in Great Falls Tribune was an unqualified holding regarding the constitutional right to know; not merely a holding limited to the particular facts of that case. See Great Falls Tribune, ¶ 54. Moreover, this holding is little more than a restatement of Article II, Section 9, which provides that “[n]o person shall be deprived of the right to examine documents . . . except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.” (Emphasis added.) This plain and unambiguous language means that when the balance is even, the right to know trumps, thus requiring disclosure. In fact, even if the balance is slightly in favor of individual privacy, the right to know still trumps, thus requiring disclosure. It is only when the balance is clearly in favor of individual privacy that the documents may be properly withheld from the public. It is at this stage, and this stage only, that the right to individual privacy trumps the right to know.
¶70 Thus, the plain language of the Constitution requires that disclosure is the rule, and withholding public documents based on individual privacy is the exception. The term “except” in Section 9 necessarily makes withholding information based on privacy the exception under elemental rules of statutory interpretation. Thus, the right to know is superior in that it presumptively trumps the right to individual privacy in the context of right-to-know cases. And, if this plain language were not clear enough, the transcripts of the *359 Constitutional Convention make it unquestionable. As the venerable Delegate Dorothy Eck stated, with regard to Section 9, “we added the word ‘clearly’ with the intention of tipping the balance in the favor of the right to know.” Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1670 (emphasis added).
¶71 Simply put, the presumption of openness, which we formally recognized in Great Falls Tribune, is contained in the plain language of Section 9. It does not depend in any way on the particular facts of Great Falls Tribune, nor is it qualified thereby. The Court’s suggestion to the contrary blatantly disregards the plain language of Section 9.
¶72 The Court goes on to observe that the presumption of openness and the government’s affirmative duty of disclosure “cannot be read to nullify the need, in the first instance, to balance the right to know against the conflicting right of individual privacy on an ad hoc basis when both rights are at issue.” Of course, the plain language of Article II, Section 9, mandates this conclusion. However, in balancing these two rights, as noted above, the presumption of openness is the guiding principle and it is not overcome unless the right of individual privacy clearly exceeds the merits of public disclosure.
¶73 Despite the clear language of Section 9 which discloses the presumption of openness, and despite the government’s affirmative duty of disclosure as articulated by this Court, government agencies have repeatedly demonstrated a disregard and misunderstanding of the public’s right to know. We see it in this case, in the cases we have considered over the years, and in a recent study which Professor Fritz Snyder recounts as follows:
In 2003, a survey in Montana showed an 81 percent success rate in obtaining public information from public agencies. However, nearly half of Montana’s county sheriffs violated the state’s Open Records Law by refusing to release their jail rosters. The sheriffs or their employees claimed the inmate lists were confidential. The Daniels County sheriff said he did not care what the law said: “He wasn’t about to let anyone see his list of recent crime calls without a court order.” “A District Court clerk in Chinook took it upon herself to censor the roster of court cases by removing ones ‘the public doesn’t need to know about.’” In six counties, officials said it would take a court order to get the information. “In all, just 11 counties provided the reports at the first request from the citizens making the checks.” Judith Basin County Sheriff Robert Jacobi said that his office “has a responsibility not to disclose the misfortunes of people in the community to anyone who walks in off the street.”
*360 Fritz Snyder, The Right to Participate and the Right to Know in Montana, 66 Mont. L. Rev. 297, 317-18 (Summer 2005) (citing, inter alia, Bob Anez, Records Audit Reveals Barriers, MISSOULIAN, Oct. 22, 2003, at Al. Among the items requested was a copy of each sheriffs report of the incident calls handled in the previous twenty-four hours.).[4]
¶74 Given the govemment’s-especially law enforcement’s-track record, it is no wonder that the Newspaper seeks the implementation of a policy.[5] Because the right to know is a fundamental right, it is indeed necessary that government agencies implement policies to effectuate the public’s ability to exercise this right on a consistent basis and in an expedient fashion. Otherwise, the presumption of openness will be constrained by the whims of bureaucrats who may or may not fully understand or wish to concede the public’s fundamental right to know. Of course, privacy interests must be considered in light of the unique facts attendant to the various scenarios which will arise. Thus, no policy could serve as a substitute for the necessary ad hoc determinations to be made by government agencies in the first instance. However, a policy would help to facilitate the public’s right to know by at least providing a systematic process for making each ad hoc determination.
¶75 For example, a policy could specify who would make the disclosure determination and how it would be made; it could specify a definite timeline for this determination;[6] and it could provide for an explanation to be given to the public when information is withheld. Additionally, a policy could set guidelines for the redaction of information which is generally protected by the right of individual privacy. Further, a policy could also serve to educate those in the agency as to the presumption of openness and the government’s affirmative duty of disclosure. In this way, a formal policy could reduce the number of lawsuits instituted to *361 obtain public information. Consequently, if fewer lawsuits occur, fewer public funds will be spent on litigation and awards of attorney fees to those who must vindicate their right to know through a lawsuit. Indeed, the instant dispute may have been averted if the Police Department had been operating pursuant to a policy which honored the public’s right to know.
¶76 Conversely, with no policy in place, government agencies will inevitably continue to fail in their affirmative duty to make their records publicly available. We will continue to see abuses such as that perpetrated in this case-i.e., withholding public information for well over two months, thus forcing the Newspaper to file suit, and then turning over the information before an adjudication on the merits. As a result, the public will continue to pick up the tab for needless lawsuits instituted to obtain undisputedly public information.
¶77 The Newspaper’s effort to remedy this situation finds support in another constitutional context; the United States Supreme Court has indicated that the government may not delegate unbridled discretion to bureaucrats whose official decisions may impinge on the free speech guarantee of the First Amendment. In Forsyth County, Ga. v. Nationalist Movement (1992), 505 U.S. 123, 124, 112 S.Ct. 2395, 2398, 120 L.Ed.2d 101, the United States Supreme Court considered an assembly and parade ordinance which allowed the government administrator to vary the licensing fee for assembling or parading to reflect the estimated cost of maintaining public order. While some prior restraints on speech are constitutionally acceptable, the Supreme Court stated, a regulation of this type may not delegate overly broad licensing discretion. Forsyth County, 505 U.S. at 130, 112 S.Ct. at 2401 (citations omitted). In fact, the decision observes, a governmental regulation of this type which can be arbitrarily applied is inherently inconsistent with a valid restriction on the freedom of speech. Forsyth County, 505 U.S. at 130, 112 S.Ct. at 2401 (citation omitted).
¶78 The ordinance at issue contained no articulated standards, it did not require the administrator to rely on any objective factors, and it did not obligate the administrator to provide an explanation for the decision rendered. Forsyth County, 505 U.S. at 133, 112 S.Ct. at 2403. Having observed these facts, and having noted that “[t]he decision how much to charge ... is left to the whim of the administrator,” the Supreme Court held: “The First Amendment prohibits the vesting of such unbridled discretion in a government official.” Forsyth County, 505 U.S. at 133, 112 S.Ct. at 2403.
¶79 I believe the same principle holds true here in the context of the fundamental right to know. While the ordinance at issue in Forsyth *362 County granted overly broad discretion to the administrator, Havre’s lack of a formal policy in this case effectively grants boundless discretion to the Police Department in its decisions regarding the public’s right to know. This unbridled discretion is inherently inconsistent with the presumption of openness, as it conditions the public’s timely exercise of a fundamental right on the whims of whomever may be available to disseminate public information from the Police Department at a given time.
¶80 While openness is critical in any Montana government agency, it is particularly critical in law enforcement agencies because of the enormous power they wield. Our law enforcement agencies serve the public in a conscientious and honorable manner, but they are nonetheless bound by the same constitutional principles as other government actors and, specifically, to an affirmative duty to make their records available to public scrutiny. As we have stated,
the delegates to the Constitutional Convention made a clear and unequivocal decision that government operates most effectively, most reliably, and is most accountable when it is subject to public scrutiny. .. .
While on any given occasion there may be legitimate arguments for handling government operations privately, the delegates to our Constitutional Convention concluded that in the long-term those fleeting considerations are outweighed by the dangers of a government beyond public scrutiny.
Great Falls Tribune v. Day, 1998 MT 133, ¶¶ 34-35, 289 Mont. 155, ¶¶ 34-35, 959 P.2d 508, ¶¶ 34-35.
¶81 The Court of Appeals for the Sixth Circuit has stated:
When government begins closing doors, it selectively controls information rightfully belonging to the people. Selective information is misinformation. The Framers of the First Amendment “did not trust any government to separate the true from the false for us.” Kleindienst v. Mandel, 408 U.S. 753, 773, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (quoting Thomas v. Collins, 323 U.S. 516, 545, 65 S.Ct. 315, 89 L.Ed. 430 (Jackson, J., concurring)). They protected the people against secret government.
Detroit Free Press v. Ashcroft (6th Cir. 2002), 303 F.3d 681, 683. Although these statements were made with regard to the United States Constitution, they are nonetheless applicable here. On a similar note, J. Robert Oppenheimer, the father of the atomic bomb, has observed a principle that underlies Montana’s right to know:
We do not believe any group of men adequate enough or wise enough to operate without scrutiny or without criticism. We know *363 that the only way to avoid error is to detect it, that the only way to detect it is to be free to inquire. We know that in secrecy error undetected will flourish and subvert.
¶82 The right-to-know guarantees of our Constitution, Article II, Section 9, are among the most important fundamental guarantees that Montanans enjoy. As we have recognized, quoting the Bill of Rights Committee, Section 9 arises
out of the increasing concern of citizens and commentators alike that government’s sheer bigness threatens the effective exercise of citizenship. The committee notes this concern and believes that one step which can be taken to change this situation is to Constitutionally presume the openness of government documents and operations.
Bryan v. District, 2002 MT 264, ¶ 31, 312 Mont. 257, ¶ 31, 60 P.3d 381, ¶ 31 (quoting the 1972 Montana Constitutional Convention, Vol. II at 631).
¶83 In recognition of the vital importance of the public’s right to know, and given the premature resolution of the Newspaper’s claim for the implementation of a policy, I would reverse and remand with instructions that Havre must answer the Newspaper’s Complaint to further the development of the factual record in this case. Because this Court orders dismissal without prejudice, the Newspaper will be forced to re-file its Complaint before proceeding with its claim for the implementation of a policy.[7]
¶84 The Constitution has been the supreme law of this State for more than thirty years. It is wholly unacceptable that the media and public are still met with intransigence, stalling tactics, and delay, and are ultimately forced to litigate to obtain public documents to which they are constitutionally entitled. We see far too many of these cases each year — and there are more waiting in the wings as we hand down this Opinion. Simply put, the Newspaper should not have been forced to sue in order to exercise the constitutional right to know. And, when the Newspaper is forced to sue, it should be entitled to attorney fees. *364 Indeed, we should recognize by now that governmental disregard for the public’s right to know will continue ad infinitum unless the custodians of public documents appreciate that violations of the right-to-know provisions of the Constitution will, in the usual course, result in an award of attorney fees in favor of the requestor and against the local government.
¶85 A closed government is an evil government: it abuses trust, it perverts truth, it misappropriates faith, and, in the end, it reviles the petitions of its citizens to know how they are governed and by what manner of people. Our right to know is too fundamental to be entrusted to the whims of those who neither understand its constitutional birthright nor honor its power to breach the wall of secrecy that divides the government from the governed.
¶86 I dissent.
JUSTICE COTTER joins in the concurring and dissenting Opinion of JUSTICE NELSON.

 As the Court notes, the Newspaper fails to present any appellate argument as to its claim regarding the cost of obtaining copies of public documents. Notwithstanding the deficiency in the Newspaper’s appellate brief, this claim deserved to be litigated. After all, why should a government agency be allowed to profit from a citizen’s exercise of his or her constitutional right to know? And what possible justification could there be for allowing an agency to potentially restrict access to public information by way of excessive copy fees?

 Incidentally, the only “creative endeavor” involved in this appeal is the Court’s decision to undertake the assumption that “Havre apparently does have a policy” for handling requests such as the Newspaper made here-i.e., referral to Officer Barthel. Nothing in the record establishes that referrals to Barthel constitute a “policy.” Moreover, no legitimate policy can depend on one person for its implementation in a bureaucratic organization. If Barthel is solely responsible for handling these requests, then the public’s ability to exercise its right to know is restricted to the hours of Barthel’s weekly work schedule, as well as those periods of time when he is not on sick leave, vacation leave, or preoccupied with other pressing matters which require police attention.

 Article II, Section 8 provides: “Right of participation. The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law.”

 Further study of the Freedom of Information Act survey to which Professor Snyder refers can be made at the Montana Associated Press website: http://www.ap.org/montana/MTFOI.html (last visited August 15, 2006). See also http://foi.missouri.edu/openrecseries/mt/countycomphance.html (last visited August 15, 2006).

 The Court asserts that I am relying on facts outside the record. Of course, my opinion here, both in concurrence and dissent, is based solely on the facts of record and the relevant law. Although I have referenced facts outside the record, I most certainly do not “rely” on these facts in forming my opinion. Plainly, my reference to the Freedom of Information Act survey is only an observation regarding the context in which this cases arises; not a factual basis on which I rest my opinion.

 The right to know means little if public officials are allowed to withhold public information for indefinite periods of time or until current news becomes stale news.

 The Court’s formal resolution of this case is needlessly ambiguous. The Court correctly frames Issue Two as a question of whether the District Court erred in granting summary judgment. However, the Opinion does not expressly answer this question. Rather, it only implies that an error was committed. Similarly, the Court does not formally reverse the District Court’s Order. Of course, reversal is the only basis for the remand in this case. Yet, the Court declines to employ the precision which has traditionally defined our opinions, choosing instead to place today’s Opinion in a nebulous category of resolution wherein remand is proper without a reversal, pursuant to an implied conclusion that some error has been committed. No legal precedent provides support for this approach.